JjBROWN, C.J.
The City of Bossier City (“the City”) invited competitive bids for a project to clear a 22-acre tract of land adjacent to the Red River. The project site was historically used as a construction landfill and contained a number of buildings, a stockpile. of dirt, construction debris, trees, underbrush, and assorted piles of bricks. The bid specifications required the removal of all buildings, appurtenances and slabs, trees, stumps, roots, protruding obstructions, surface objects and final clearance grubbing or grading. A 60-day time limit was set so that construction for the Bass Pro Shop could begin as scheduled.
On August 27, 2002, Roy Sattler Constructions, Inc. (“Sattler”) entered a bid of $27,000 for the project. Two other bids were submitted, one by E.J. Construction in the amount of $69,880 and one by Lou Chandler, Inc. in the amount of $121,650. *504 The trial court noted in its oral reasons for judgment that “Lou Chandler and his daddy dumped (steel and concrete and bricks and everything else) on that site for years.”
The City’s project manager, Pam Glorio-so, questioned Sattler about his bid. Satt-ler told her that he intentionally bid low in hopes of receiving future work on the Riv-erwalk project. In his testimony at trial, Sattler explained how he calculated the bid. He felt that he could easily take down the trees and burn them on the property. He believed that he could sell the “stuff’ in the buildings and the buildings themselves and have them removed by the buyer(s). He further stated that he had lined up a place to take the slabs with no dumping fees, that he could crush the bricks and use 12them on a road, that there was enough dirt from the site to use for grubbing, and finally, that he could sell the stockpile of dirt sitting on the tract for about $28,000.
Sattler was awarded the contract and began work on the project. When Sattler dug out and pushed over the first tree, he found that the roots were entangled with debris such as concrete, I-Beams, and re-bar. He called the City and met with its officials, including Pam Glorioso, to talk about what he had uncovered. The City and its engineers determined that the subsurface debris did not need to be removed and that construction could proceed on top of it; however, the debris uprooted with the trees would need to be either hauled off or put back into the holes from which it came and covered with dirt.
Sattler realized that removing the trees would be more difficult than he anticipated and wanted to be paid extra for any debris associated with the trees that he had to haul off site. The City agreed to an additional cost of $13.20 per yard for hauling off the uprooted subsurface materials related to the removal of trees. Glorioso informed Sattler that he was to send invoices for the work to Glorioso and that change orders would then be made. Apparently no one considered that the other two bidders may have included this circumstance in the calculation of their bids.
Over the course of October and November 2002, Sattler presented four invoices to the City. On October 1, 2002, Sattler sent the first invoice, stating that the job was 60% finished and requesting 60% of the original contract payment ($16,200 of the $27,000 original bid). On October 7, | s2002, Sattler sent the first of three invoices regarding the removal of subsurface material associated with the trees. This invoice stated that Sattler had removed 768 yards of material and requested a payment of $10,137.60. This invoice was not questioned, a change order was issued, and Sattler was paid by check dated October 11, 2002. The next invoice, issued October 16, 2002, requested $53,380.80 for the removal of 4,044 yards of material. Another change order was issued, and this too was paid without question by check dated November 1, 2002. The final invoice was dated November 17, 2002, and requested $288,367.20 for the removal of 21,-846 yards of subsurface material. This invoice was questioned by the City.
Upon having the November 17, 2002, invoice disputed, Sattler offered to amend the invoice by deducting 10,000 yards of materials removed, thereby reducing the price by $132,000. The City offered Satt-ler a final payment of $32,015.20. Sattler refused and filed the instant suit in the 26th Judicial District Court.
The trial court, in an oral ruling that harshly criticized both the City and Satt-ler, concluded that the change in the contract between Sattler and the City was in violation of Louisiana’s public bid law and was null and void. The trial court ruled *505 that no further payment was due, including the $32,015.20 offered by the City. Sattler has appealed. We affirm.

Discussion

Under Louisiana’s Public Bid law, any alteration, deviation, addition, or omission as to a preexisting public work contract is a “change order.” |4La. R.S. 38:2211(A)(3). A change order outside the scope of the contract means a change order which alters the nature of the thing to be constructed or which is not an integral part of the project objective. La. R.S. 38:2211(A)(5). All change orders shall be in writing. La. R.S. 38:2212(A)(5).
Although the removal of subsurface debris was outside the scope of the original bid, the removal of trees and stumps was clearly within the specifications of the contract. Considering Sattler’s entrepreneurship in selling what was on the surface, tree removal was what Sattler figured to be his significant cost. Sattler mistakenly thought this task would be easier than it was. That the removal of the trees and stumps was more difficult than Sattler anticipated does not provide a reason to conclude that this was outside of the scope of the original specifications and bid.
Eventually, the City and Sattler created change orders that increased the cost of the job from $27,000 to $111,733.60 (what the City was willing to pay) or $351,885.60 (what Sattler invoiced). Even if the change orders were legitimate, they were in excess of the contract limit, and, as a matter of law, null and void. Any change order outside the scope of the contract in excess of $100,000[1] shall be let out for public bid. La. R.S. 38:2212(A)(6). Any contract entered into for the construction of public works contrary to these provisions shall be null and void. La. R.S. 38:2220(A).
The City did, however, agree to pay the cost of hauling off any excess debris uncovered in the removal of trees. Assuming arguendo that Sattler | ^should recover this hauling cost for the “extra” debris, then he would be entitled to only the amount of his expenses to do so, but not a profit. In cases in which public bid contracts have been ruled null and void, the courts have provided recovery under the principle of quantum meruit. See Coleman v. City of Bossier City, 291 So.2d 410 (La.App. 2d Cir.1974); Pugh v. Town of Logansport, 235 So.2d 226 (La.App. 2d Cir.1970); Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (1949); Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627 (1943). The Court in Boxwell stated:
Under these circumstances it would be clearly unjust to permit the Commission to reap the mentioned benefits and escape liability for them altogether. There is imbedded deeply in our civil law the maxim that no one ought to enrich himself at the expense of another, Revised Civil Code, Article 1965. On the other hand, considering the law’s expressed prohibitum for making the sales in the manner shown it would also be improper for the vendor to profit by the transactions.
Equity would favor, we think, the placing of the parties in the position that they occupied prior to the carrying out of their engagements, or in other words in status quo; but, of course, this is impossible because of the materials having been used. The only alternative is to compel payment by the vendee, or its successor, of an amount that represents the materials’ actual cost to the vendor, *506 without allowing any profits on or expenses connected with the sales. Id. at 632.
Significantly, Sattler completed the job within the 60-day time limit and did not have to haul in any fill materials or dirt to finally grade the tract. The trees Sattler pushed over were burned, and the holes were filled with the same materials uncovered in uprooting the trees.
The men working on the removal of the trees and stumps testified that the vast majority of the materials removed in digging out the trees and stumps were placed back in the holes as filler. In addition, the City’s expert | ^witness testified that, based on elevation calculations of a 13-acre portion of the 22-acre project site taken before the project and after the project’s completion, the elevation of that area changed by only 5/16 of an inch. This would result in about 1000 yards of dirt being used to replace the removed subsurface debris versus a void of 26,658 yards created by the amount of material Sattler claims to have removed. Since Sattler did not bring in any fill material from off-site, the City argues that Sattler could not have hauled off what he claims.
We note that the total cost Sattler claimed subcontractors charged him for hauling off these materials was $43,935. Thus, at best, under the principle of quantum meruit, Sattler would be entitled to a recovery of $43,935.
Sattler is entitled to $27,000 for the original bid, which included the tree removal. Assuming for the purposes of this opinion that he is entitled to costs for hauling off extra debris, then that would be at best an additional $43,935, for a total of $70,935. To date, Sattler has been paid a $16,200 advance on the original contract and $66,130.80 for the first two change orders, for a grand total of $82,330.80. Thus, the City of Bossier owes Roy Sattler Construction, Inc. no further payment.
Conclusion
The trial court’s decision is affirmed.

. The $100,000 "contract limit” includes the cost of labor, materials, and equipment as per the rates in the latest edition of the Associated Equipment Dealers Rental Rate Book and administrative overhead not to exceed fifteen percent. La. R.S. 38:2212(A)(l)(d).